**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

CODA CARNES,

                Plaintiff,

v.                              CIVIL ACTION NO.  2:07-cv-00523

DEVON ENERGY CORPORATION and
PENNZOIL QUAKER STATE COMPANY,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending are parties cross motions for summary judgment [Docket 23 and 25].
I **DENY** the Plaintiff's motion and **GRANT** the Defendants' motion.

**I.  FACTUAL BACKGROUND**

Pennzoil Products Company ("Pennzoil") owned and operated a facility in West Virginia

("West Virginia Facility") at all relevant times prior to November 17, 1999.  On March 4, 1974,

Pennzoil  hired Mr. Carnes as an hourly bargaining unit employee at the West Virginia Facility.

Pennzoil changed its name to PennzEnergy Company (PennzEnergy") and, in August 1999,

PennzEnergy merged with Devon Energy Corporation ("Devon").

Mr. Carnes worked at the West Virginia Facility for Pennzoil /PennzEnergy and then

Devon affiliate Devon Energy Production Company, L.P. ("Devon Production") until November

17, 2000, when Devon Production terminated his employment.  During Mr. Carnes' employment at the West Virginia Facility, he and the other bargaining unit employees were represented for purposes of collective bargaining by the Chauffeurs, Teamsters, and Helpers Local Union No. 175, Affiliated with the International Brotherhood of Chauffeurs, Warehousemen and Helpers ("Union").  In 1997, Pennzoil and the Union negotiated a collective bargaining agreement ("CBA") covering the West Virginia Facility.

In June 2000, Devon Production reached an agreement to sell its West Virginia Facility to East Resources, Inc. ("East").  As a consequence of the impending sale of the West Virginia Facility, Devon Production and the Union negotiated an Effects Bargaining Agreement[1] dated September 15, 2000.  As part of this agreement, the CBA's expiration date was extended to the date of the asset sale closing.  On November 17, 2000, Devon Production sold the West Virginia Facility to East.  On the same date, Devon Production terminated the employment of Mr. Carnes and all of its other hourly bargaining unit employees at the West Virginia Facility.  East offered employment to many of the Devon Production employees, including Mr. Carnes.  Mr. Carnes accepted the offer of employment and continues to work for East.

At all relevant times prior to December 31, 1990, Pennzoil  provided pension benefits to the hourly bargaining unit employees who worked at the West Virginia Facility through the Pennzoil Products Company Retirement Plan for Production and Maintenance Employees in West Virginia Represented by Chauffeurs, Teamsters, and Helpers Local Union No. 175, Affiliated with the International Brotherhood of Chauffeurs, Warehousemen and Helpers

---

[1]"Effects bargaining" relates to bargaining about the consequences of an employer terminating or selling one of its locations. *First National Maintenance Corp. v. N.L.R.B.*, 452 U.S. 666, 681 (1981).

("Pennzoil Hourly Plan").  Effective as of December 31, 1989, and pursuant to the Sixth

Amendment to the Pennzoil Hourly Plan,  Pennzoil changed the name of the Pennzoil Hourly

Plan to the PennzEnergy Company Retirement Plan for Production and Maintenance Employees

in West Virginia Represented by Chauffeurs, Teamsters, and Helpers Local Union No. 175,

Affiliated with the International Brotherhood of Chauffeurs, Warehousemen and Helpers

("PennzEnergy Hourly Plan").  Thereafter, the PennzEnergy Hourly Plan provided pension

benefits to the hourly bargaining unit employees who worked at the West Virginia Facility.

Effective October 2, 2000, and pursuant to the First Amendment to the PennzEnergy

Hourly Plan and the Eleventh Amendment to the PennzEnergy Company Salaried Employees

Retirement Plan ("PennzEnergy Salaried Plan"), Devon merged the PennzEnergy Hourly Plan

into the PennzEnergy Salaried Plan.   Thereafter, the PennzEnergy Salaried Plan provided

pension benefits to the hourly bargaining unit employees who worked at the West Virginia

Facility. According to the Eleventh Amendment to the PennzEnergy Salaried Plan, the benefits

for the bargaining unit employees who worked at the West Virginia Facility were to be

determined in accordance with the terms of the PennzEnergy Hourly Plan.[2]  Effective May 1,

2002, Devon merged the PennzEnergy Salaried Plan into the Retirement Plan for Employees of

Devon Energy Corporation ("Devon Retirement Plan").  Thereafter, the Devon Retirement Plan

provided pension benefits to the hourly bargaining unit employees who had worked at the West

Virginia Facility.  Again, however, benefits for the bargaining unit employees who had worked

_____

[2] "The terms of benefits provided under this Section shall be those described in the WV
Plan as it was in effect on October 2, 2000...".  (AR at DEV00210).

3

at the West Virginia facility were to be determined under the PennzEnergy Hourly Plan.[3]
Accordingly, for purposes of this case, it is my view that Mr. Carnes' pension benefit should be
determined under the terms of the PennzEnergy Hourly Plan, as incorporated into and made part
of the Devon Retirement Plan.

When Devon Production terminated Mr. Carnes' employment on November 17, 2000, he
was approximately 48 years and 9 months old.  He had 26.6322 years of benefit service and
26.7123 years of vesting service credited under the PennzEnergy Salaried Plan.  These age and
service criteria apply to the determination of Mr. Carnes' pension benefit in this case.

On December 27, 2000, Devon advised Mr. Carnes in writing that he was entitled to a
deferred pension benefit in the monthly amount of $1,198 (without reduction for 50% joint and
survivor benefit) commencing at age 65. The letter added that "[y]ou may elect the optional
forms of benefit payments as provided for in the plan.  If you do, the payment will be further
actuarially reduced to reflect the option you elect."  (AR at DEV00391).  The parties had a very
short course of correspondence concerning commencement of the plaintiff's pension benefit. On
February 13, 2007, after reaching age 55, Mr. Carnes notified Devon that he wanted to
commence pension benefit payments. On February 22, 2007,  Devon promptly provided Mr.
Carnes with a retirement commencement packet, which included a summary of Mr. Carnes'
retirement benefit payment options and the benefit payment amounts, an Application/Election
Form, and other applicable forms to be completed by Mr. Carnes.  The listed pension benefit
payment options ranged from a high of $402.28 per month to a low of $389.71 per month.

---

[3]"With respect to the Merged Plans, each PZE participant...shall not only receive his
benefit as earned pursuant to the terms of the PZE Plan... which has accrued as of April 30,
2001,...plus any benefit which may be accrued pursuant to the terms of this Plan..."  (AR at
DEV00073).

The pension benefit was significantly lower than the plaintiff expected based on the terms and conditions as Mr. Carnes interpreted them to apply to his circumstances. On March 5, 2007, he wrote to Devon stating that he was requesting "an appeal of the partial denial of my pension benefits …."  The letter explained that

> [a]ccording to my years of service, a forty-five dollar ($45.00) multiplier and the contract provisions that were in place at the time East Resources purchased Devon Energy, the rate of discount to be used in calculating my monthly pension benefit is not more than three percent (3%).  Consequently, my monthly pension benefit would be approximately $924.30, rather than the $402.26 estimated by Devon Energy.

(AR at DEV00418).

On April 2, 2007, Devon wrote to Mr. Carnes, stating that "[i]n reviewing your file the calculation prepared by Pennzoil is using the $45.00 Monthly Benefit Service Rate times the years of service, however, at termination 11/17/2000 you were not age 55.  The calculation used the actuarial reduction factors commencing your benefit at age 55.  This is the same set of reduction factors used by the Pennzoil calculation in your file.  I do not see any special contract provision in your file.  Please send me a copy for review."  No response was received to this inquiry from Mr. Carnes.

On July 19, 2007, Mr. Carnes filed this suit in state court alleging in a three count complaint that (1) Devon, acting as Plan Administrator of the retirement plan, refused to process his appeal of the pension benefit Devon determined he was eligible to receive at age 55; (2) Devon improperly calculated his pension benefit; and (3) that the CBA required the Devon Retirement Plan to provide the pension benefit he is seeking.  On August 23, 2007, Devon removed, asserting complete preemption under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1132(a)(1)(B) ("ERISA") and Section 301

5

of the Labor Management Relations Act, 29 U.S.C. §185 ("NLRA").

## II.  DISCUSSION

*A.      Standard of Review*

Where, as in this case, the plan gives the administrator discretion to determine benefit eligibility or to construe plan terms, the court is called upon to determine only whether the administrator abused its discretion.  *Firestone Tire & Rubber Co. v. Bruch,*  489 U.S. 101, 111 (1989). Under this standard, a plan administrator's decision will not be disturbed if it is reasonable.  *See Smith v. Continental Cas. Co.*, 369 F.3d 412, 417 (4th Cir. 2004); *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000). This is so even if the reviewing court would have come to a different conclusion independently. *See Id.*  "[A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997) (internal quotation marks omitted).

Where a plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, however, a reviewing court must also weigh that conflict "in determining whether there [has been] an abuse of discretion."  *Firestone*, 489 U.S. at 115; *see Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000). The Supreme Court recently attempted to clarify the role a conflict of interest would have in determination of abuse of discretion.  In *Glenn,* the Supreme Court stated that "a reviewing court should consider . . . [a] conflict as a factor in determining whether the plan administrator

has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (U.S. 2008).

In this case, Mr. Carnes alleges a conflict of interest based on (1) the dual roles of Devon as both sponsor and administrator of the plan and (2) belief that as a company plan, Devon is solely responsible if the plan becomes underfunded making it in the best interest of the company to pay as few benefits as possible.[4]  Prior to *Glenn*, the argument was untenable in this circuit. *See, e.g., Collucci v. Agfa Corp. Severance Pay Plan*, 431 F. 3d 170, 179 (4th Cir. 2005) ("We question how a company that creates, funds, and administers a plan for its own employees' benefit can, from those facts alone, be presumed to have a financial conflict in administering that plan when the company remains free to end the plan altogether.")  (internal citation omitted).   In *Glenn*, however, the Supreme Court observed as follows:

> The first question asks whether the fact that a plan administrator both evaluates claims for benefits and pays benefits claims creates the kind of "conflict of interest" to which *Firestone*'s fourth principle refers. In our view, it does.
>
> That answer is clear where it is the employer that both funds the plan and evaluates the claims. In such a circumstance, "every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket." The employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary. Thus, the employer has an "interest . . . conflicting with that of the beneficiaries," the type of conflict that judges must take into account when they review the discretionary acts of a trustee of a common-law trust.

*Glenn*, 128 S. Ct. at 2348 (citations omitted).

The rather sweeping language in *Glenn* may impact *Collucci* and like authorities.  I need

---

[4] The court notes, ironically, that Mr. Carnes provided year 2000 IRS filings showing the plan was 120 % funded. (AR at DEV00471).

not resolve that potential conflict at this time.[5]  I will simply use a modified abuse of discretion standard.  As discussed more fully within, however, even if the alleged conflict of interest is considered as a factor, there is no evidence it played any role in the determination of Mr. Carnes' claim for pension benefits.

B.     *Governing Law and Analysis*

1.  Failure to Process Appeal

Mr. Carnes relies upon certain ERISA provisions and implementing regulations governing the appropriate notice of a benefits determination and rights relating to a claimant's appeal of the determination.  The failure to technically comply with all of ERISA's procedural requirements, however, does not automatically invalidate an otherwise sound denial of benefits. *See, e.g., Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 238 (4th Cir.1997); *Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir.1997). "Substantial compliance" is typically sufficient. *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 127 (4th Cir.1994) (internal quotation marks omitted). To substantially comply with ERISA's regulations, an administrator must supply the claimant "with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Brogan*, 105 F.3d at 165 (internal quotation marks omitted). The case for a more relaxed procedural environment is especially appropriate in a case such as

---

[5]I also need not reach plaintiff's second argument.

8

this, where, for instance, a plaintiff is not alleging a disability based upon a voluminous medical record.

Devon and Mr. Carnes agree that the amount of his monthly accrued pension benefit at age 65 would be $1,198.45.  They also agree that some reduction is warranted to account for the fact that the plaintiff wanted to commence benefits payments starting at age 55.   There is a gap in the parties' interpretation of the applicable terms and conditions of the pension benefit plan to the plaintiff's circumstances, which only affects the bottom line amount to which Mr. Carnes is entitled.  It seems inappropriate to characterize this initial disagreement as to amount to be, as Mr. Carnes suggests, a "partial denial" of benefits.

That difference aside though, the administrative record clearly demonstrates Devon substantially complied with ERISA's procedural requirements.  Mr. Carnes states that the only information he had available to him when he sought to appeal was the 1997 Summary Plan Description ("SPD") and the letters between himself and Devon.  However,  Devon's letters of December 2000 and February 2007, as well as the Summary Plan Description, all specifically invite inquiries by the plaintiff if he needed further information or had questions.  From the record it appears he chose not to take advantage of those options.  (AR at DEV00298, DEV00392, and DEV00395).

While it appears from the record that the process was still in an "information gathering" stage, the plaintiff alleges he was never provided a full and fair review of his appeal.   The correspondence between the parties concerning the pension benefit was left at the point the ball was in the plaintiff's court.  Rather than seeking to vindicate his ERISA procedural rights by a follow-up letter or call to Devon, Mr. Carnes opted to prematurely abandon the "administrative process" of correspondence between the parties.  He instituted a civil action rather than

responding to the inquiry by Devon for a copy of his file -- specifically any special contract provisions that might affect application of the terms of the plan to his circumstances. In this letter Devon had reiterated its interpretation and position and provided Mr. Carnes the opportunity contend otherwise.  The appeal was not "denied summarily" but was left open ended with the next action required of Mr. Carnes.

In sum, Mr. Carnes prematurely abandoned the appeal process by not responding to Devon's request for information.  Mr. Carnes was neither denied proper notice nor his appellate rights.  Even were that the case though, this dispute turns on a straightforward plan interpretation.  It would be both futile and result in unnecessary expense and delay to remand the matter.  The administrative record and the parties brief suffice for purposes of review. Accordingly, I **GRANT** defendants' motion for summary judgment as to Count I and deny plaintiff's corresponding motion as to that Count.

## 2.  Improper Calculation of the Pension Benefit

The next issue hinges on eligibility definitions in plan documents and whether or not Devon abused its discretion when it determined the amount of Mr. Carnes' benefit to commence at age 55.   Mr. Carnes argues that he meets the conditions for an early retirement pension and Devon should have applied the three percent per year reduction factor that applies to such eligible participants who choose to retire prior to age 65.  Devon's position is that Mr. Carnes is by definition eligible for a deferred vested retirement benefit, not an early retirement pension. Devon contends that it reasonably and properly reduced Mr. Carnes' normal age 65 pension benefit in accordance with the actuarial equivalent reduction factors that apply to him.

10

The PennzEnergy Hourly Plan portion of the Devon Retirement Plan defines the term "Early Retirement" as follows:

> 8.2.  <u>Early Retirement</u>: A Member's Early Retirement Date is the first day of the month following his termination of employment *after the Member has completed* at least fifteen (15) years of Vesting Service *and has attained age fifty-five (55)* but not age sixty-five (65).  *A Member who retires on an Early Retirement Date shall be eligible to receive an Early Retirement Pension* commencing on his Early Retirement Date or at his election, on the first day of any month thereafter up to his Normal retirement Date, payable in accordance with the provisions of Article XIII hereof.

(AR at DEV00231)[6] (emphasis added).

The applicable reduction provision found in the PennzEnergy Hourly Plan states as follows:

> 9.3 <u>Early Retirement Pension</u>: the monthly amount of Pension for a Member who retires on his Early Retirement Date shall be his Accrued Pension at Early Retirement Date reduced by one fourth (1/4) of one percent (1%) for each month by which the commencement date of such Pension precedes the first day of the month coincident with or next following the Member's sixty-second (62nd) birthday.

(AR at DEV00233)[7].

Mr. Carnes did not qualify for an Early Retirement Pension under Section 8.2 of the PennzEnergy Hourly Plan because it is available only to one who "retires" on an Early Retirement Date, which is defined as "the first day of the month following his termination of

---

[6]The plaintiff also references the "Early Retirement" definition found in the 1992 and 1997 Summary Plan Documents (SPDs") which state "[y]ou may elect to retire at any time after attaining age 55 with 15 years of vesting service."  (Pl. Memo. in Supp. Exh. 3 and AR at DEV00366).  The analysis that follows applies equally to this definition.

[7]The plaintiff references the reduction factor found in the 1992 and 1997 SPDs which states "[e]arned benefits will be reduced 3% for each year of early retirement prior to age 62 . . ." (Pl. Memo. in Supp. Exh. 3 and AR at DEV00366). Again, the analysis that follows applies equally to this definition.

employment *after* the Member has completed at least fifteen (15) years of Vesting Service *and has attained age fifty-five (55) . . . .*" (AR at DEV00231) (emphasis added).  Mr. Carnes' employment ended on November 17, 2000, when he was less than 50 years old and thus prior to the time he "attained age fifty-five . . . ."  *Id.*  He thus did not satisfy the criteria for an Early Retirement Date, and he was not eligible for an Early Retirement Pension.

The Sixth Amendment to the PennzEnergy Salaried Plan added the following additional opportunity for any Early Retirement Pension under the PennzEnergy Hourly Plan:

> 9.5(c) Notwithstanding anything to the contrary herein, any member who (I) is described in Subsection 9.5(a) hereinabove, (ii) *was 50 years old or older as of the date of the closing of the transaction contemplated in that certain Purchase and Sale Agreement dated 6/15/2000 by and between Devon Energy Production Company, L.P. and East Resources, Inc. ("East"), (iii) has a minimum of 15 years service as of the closing date*, (iv) was employed by the Employer as a full time employee immediately prior to the Closing Date or was on short term disability, *and was not offered employment by East immediately after the Closing Date*, and (v) makes a timely election of early retirement by the Closing Date in accordance with Plan procedures, shall be eligible to receive an Early Retirement Pension commencing on the first day of the month following the later of the Closing Date or his attainment of age 55.  Such Early retirement Pension shall be payable in accordance with the provision of Article XIII hereof.

(AR at DEV00209) (emphasis added).  This provision also excludes Mr. Carnes from qualifying for an Early Retirement Pension under Section 9.5(c) due to the facts that (1) he had not yet attained age 50 when Devon Production sold the West Virginia Facility to East on November 17, 2000, and (2) he was offered employment with East.

Mr. Carnes contends that he satisfied the requirements for an Early Retirement Pension under Section 8.2 because he had a retirement date when he filed his pension application after having completed 15 years of service and attaining age 55.  As accurately pointed out by the defendants, however, controlling case law and common understanding support Devon's interpretation of the retirement date provisions.

It is well settled that to "retire" and take advantage of an early retirement provision, the individual must be working for the company when he reached the early retirement age. Simply attaining the early retirement age after employment ends is not sufficient and would render anyone who worked for the required number of years eligible for an early retirement pension upon reaching age 55, regardless of the fact they were not employees at that time. In *Fuller v. FMC Corporation*, 4 F. 3d 255 (4th Cir. 1993), employees who had ceased working for the company prior to age 55, but with the required credited years of service, claimed that they should receive the early retirement benefit once they attained age 55. The plan disagreed and the court of appeals sustained the plan's interpretation:

> When an employee is terminated from the company's employment before age 55, we think it obvious that, in the absence of provisions stating otherwise, he cannot elect *early retirement* from that company after age 55. Retirement by definition presupposes an employer-employee relationship. Since Fuller's and Click's employment with FMC was terminated before they reached age 55, they could not *retire* after age 55.

*Id.* at 261 (emphasis added); *see also Appoini v. Sunshine Biscuits, Inc.*, 809 F. 2d 1210, 1219, (6th Cir. 1987) ("Plaintiffs argue that this court should construe the pension plan to confer early retirement benefits upon those employees with fifteen years of service regardless of whether they were employed at the bakery at age fifty-five . . . . 'Retire' means 'to withdraw from office, public station, business occupation, or active duty.' [*Webster's New International Dictionary* at 1939 (3d ed. 1981)]; *see also Black's Law Dictionary* 1183 (5th ed. 1979) ("retire means '[t]o terminate employment or service upon reaching retirement age.'"). *Those individuals who left Sunshine's employ before age fifty-five were not 'employees' when they reached age fifty-five and thus could not 'retire' on that date.*") (emphasis added)); *Hein v. FDIC,* 88 F. 3d 210, 215 (3d Cir. 1996) (stating "[s]ubsection 5(a) provides that an individual may be eligible for early

retirement benefits if he retires 'on the first day of any calendar month in which he attains his

fifty-fifth birthday. . . .'  Hein was terminated before the first day of the month in which he

would reach his fifty-fifth birthday.  Thus, he was not eligible for early retirement benefits under

Subsection 5(a).'").  Mr. Carnes does not address these authorities.[8]

Having been terminated from employment prior to the age of 55, Mr. Carnes qualified

for a Deferred Vested Pension as defined in Section 10.1 of the PennzEnergy Hourly Plan.  This

section states in pertinent part:

> If a Member's employment is terminated for any reason other than
> Normal, Postponed or Early Retirement or death after he has completed at least
> five (5) years of Vesting Service and he does not withdraw his Member
> Contributions, then he shall be entitled to a Deferred Vested Pension equal to his
> Accrued Pension at his date of termination.  *Any Deferred Vested Pension*
> *payable shall commence on his Normal Retirement Date, unless the Member*
> *elects earlier commencement to be effective on the first day of any month*
> *following his fifty-fifth (55th) birthday and prior to his Normal Retirement Date.*
> *If the Member elects earlier commencement, the Pension otherwise payable shall*
> *be reduced on an Actuarially Equivalent basis.*

(AR at DEV00243) (emphasis added).  The plan definition of "actuarial equivalent," applicable

actuarial tables and explanation of the procedures followed by Devon were produced as part of

---

[8]Mr. Carnes' interpretation of the early retirement date provisions would render special early retirement provisions added through plan amendments and the Effects Bargaining Agreement meaningless.  The plan's Seventh Amendment states that employees who, as of March 1, 1999, had 15 years of service, had reached age 52, and elected to retire by April 15, 1999, would be eligible for an Early Retirement Pension.  (AR at DEV00293).  The Sixth Amendment and the Effects Bargaining Agreement state that employees who had 15 years of service, had attained age 50 by the date of the sale to East, and were not being offered jobs by East would be eligible for an Early Retirement Pension.  (AR at DEV00209 and Tab 16 at 3).  If, as Mr. Carnes suggests, terminated employees with 15 years of service were already eligible for an Early Retirement Pension once they attained age 55, then the foregoing special early retirement provisions would be meaningless.

14

the administrative record[9].  (AR at DEV00218, DEV00414 to DEV00417, and DEV00420 to

DEV00426).  It appears Devon properly calculated Mr. Carnes' pension benefit given the age at

which he was seeking to commence payment benefits and the proper provisions of the plan.

In an appeal to fairness, a concern to which courts are rightly sensitive, Mr. Carnes does

rely heavily upon ERISA's "anti-cutback" rule.  The rule, found in 29 U.S.C. § 1054(g)(2),

states that "a Plan Amendment which has the effect of  . . . eliminating or reducing an early

retirement benefit . . . with respect to the benefits attributable to service before the Amendment

shall be treated as reducing accrued benefits."  *Id.*  There has been no plan "amendment" in this

action, however, that resulted in elimination or reduction of  the pension benefit to which Mr.

Carnes was entitled.   While I am sympathetic to the unfavorable monetary position with which

Mr. Carnes is left given his particular set of circumstances, the applicable plan provisions must

be applied as written.  To the extent an interpretation, as opposed to simply an application, of the

plan provisions was even necessary, Devon reasonably and appropriately construed them. The

plaintiff is now, and was always, eligible only for a deferred pension benefit and not an early

retirement pension.   The anti-cutback rule does not apply.

### 3. Application of the CBA

The plaintiff's theory of alternative recovery under the CBA is without merit.   First, the

---

[9]The SPDs relied upon by Mr. Carnes have likewise provisions defining deferred vested
retirement for those individuals whose employment is terminated for any reason other than
normal or early retirement or death *after* completing at least five years of vesting service.  (Pl.
Memo. in Supp. Exh. 3 at page 68 and AR at DEV00366).  If the individual elects early
commencement of the deferred pension it will be reduced on an actuarially equivalent basis. *Id.*

CBA is not inconsistent with the Devon Retirement Plan and the plaintiff's entitlement would be the same regardless.  Section 12.3 of the CBA states:

> Normal retirement shall be the first of the month following an employee's sixty-fifth birth date, however, an employee's monthly retirement benefit shall not be discounted for early retirement after age sixty-two (62). The rate of discount is three percent (3%) per year for an employee retiring after age fifty-five (55) and before age sixty-two (62).

(AR at Tab 15) (emphasis added).  It appears clear that the rate of discount mentioned in the second sentence relates to the "early retirement" discussed in the first sentence which in turn, refers to the Early Retirement Pension described in Section 8.2 of the PennzEnergy Hourly Plan. Section 8.2 and its inapplicability to the plaintiff has been explained in depth in the foregoing discussion.  Additionally, applying the controlling case law on the definition of "retirement" to Section 12.3 leaves Mr. Carnes ineligible for the 3% reduction factor referenced in the CBA.

Second, by the plaintiff's own admission the CBA was not renewed by the defendants and expired in 2000.  Mr. Carnes argues his claim for pension benefits did not originate until he turned 55 in 2007, however, the administrative record shows that the dispute concerning qualification for an Early Retirement Pension for employees who ceased working before they attained the age needed to qualify had been ongoing for some time. In April 1999, PennzEnergy clearly advised Union representatives that under the terms of the Hourly Plan and the SPD, employees who ceased working before the attained the age needed to qualify for an early Retirement Pension were entitled only to a Deferred Vested Pension that would be reduced for early commencement in accordance with the Actuarial Equivalent factors.  (Def. Mem. in Oppos. Exh. 1).  Articles 10.1 and 10.2 of the SPD setting forth the pension benefit for terminated vested employees were both explicitly referenced in that communication. *Id.*  Thus

the Union knew or should have known that unless Devon agreed in the September 2000 Effects Bargaining Agreement to change the Hourly Plan and SPD that individuals like Mr. Carnes, whose employment terminated before they attained the age needed to qualify for an Early Retirement Pension, would be eligible only for a Deferred Vested Pension and appropriate actuarial reductions. The Effects Bargaining Agreement was executed in September of 2000 without a provision that applied to Mr. Carnes situation and nothing in the agreement or otherwise obligated the parties to address the issue later.  It appears any cause of action Mr. Carnes' had against the Union became ripe at that time; however, there is no proof he that he exhausted his administrative remedies under the CBA nor sued the Union for breach of its duty of fair representation.  Mr. Carnes cannot maintain a claim based on a violation of  the CBA given he has not previously exhausted those remedies.  *See Thompson v. Aluminum Co. of America,* 276 F.3d 651, 656-657 (4th Cir) 2002.

Based upon the foregoing discussion, Devon's interpretation and application of the plan was reasonable and not an abuse of discretion.  Accordingly, it is **ORDERED** as follows:

1.) the plaintiff's motion for summary judgment is **DENIED** [Docket 25];

2.) the defendants' motion for summary judgment is **GRANTED** [Docket 23]; and that

3.)  this action is **DISMISSED** and **STRICKEN** from the docket.[10]

---

[10]Given that there is no basis on the merits for relief against either defendant, I decline to reach Pennzoil's argument that it was an improper defendant in this case.

17

The court **DIRECTS** the Clerk to send a copy of this Opinion and Order to the counsel of record and any unrepresented party.

Enter:  July 16, 2008

Joseph R. Goodwin, Chief Judge